Case No. 22-1330

# United States Court Of Appeals
## FOR THE SIXTH CIRCUIT

MIDWEST TERMINALS OF TOLEDO INTERNATIONAL, INC.,

Plaintiff-Appellant,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, INTERNATIONAL LONGSHOREMEN'S DIVISION – GREAT LAKES DISTRICT COUNCIL, LOCAL 1982, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,

Defendants-Appellees.

**On Appeal from the United States District Court
for the Northern District of Ohio (Toledo); Case No: 3:18-cv-02560-JJH**

**BRIEF OF APPELLANT MIDWEST TERMINALS OF TOLEDO INTERNATIONAL, INC.**

Aaron T. Tulencik
Tulencik Law Firm
7720 Rivers Edge Drive
Suite 126
Columbus, OH 43235
Telephone: (614) 406-1127
atulencik@icloud.com

Lauren S. Kuley
Shams H. Hirji
Squire Patton Boggs (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 361-1200
lauren.kuley@squirepb.com
shams.hirji@squirepb.com

*Attorneys for Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 6th Cir. R. 26.1, Midwest Terminals of Toledo International, Inc. makes the following disclosures:

I.  Are said parties a subsidiary or affiliate of a publicly-owned corporation?

No.

II. Is there a publicly-owned corporation, not a party to the appeal, which has a financial interest in the outcome?

No.

/s/ Lauren S. Kuley
Counsel for Midwest Terminals of
Toledo International, Inc.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .................................................. i

TABLE OF CONTENTS................................................................................ ii

TABLE OF AUTHORITIES ......................................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................... viii

INTRODUCTION .........................................................................................1

JURISDICTIONAL STATEMENT................................................................ 3

STATEMENT OF THE ISSUES.................................................................... 3

STATEMENT OF THE CASE ....................................................................... 4

    I.     Local 1982 Was Once the Certified Collective Bargaining Representative of Midwest's Workers but Lost That Status after Losing Most of the Workers' Support. ............................. 4

    II.    The Unions First Threatened Shipping Companies in 2013. ........................................................................................ 5

    III.   After the ILA Placed Local 1982 into Trusteeship, the Unions Devised a Scheme to Pressure International Shipping Companies with the Ultimate Goal of Pressuring Midwest ............................................................................... 6

    IV.   Under the Scheme, Shipping Pilots Refused to Navigate International Ships In and Out of Port Waters Upon Seeing the Unions' Signal. ......................................................8

    V.    The Unions Conducted Eight Blockades Between 2017 and 2018 that Trapped International Shipping Vessels In or Around the Port.................................................................. 9

    VI.   Midwest Initially Sought Relief from the NLRB.......................14

    VII.  Midwest Next Sought Relief in Federal Court, and the District Court Eventually Dismissed Midwest's Claim.............15

SUMMARY OF ARGUMENT .....................................................................17

STANDARD OF REVIEW ......................................................................... 23

ARGUMENT............................................................................................... 24

I.    Midwest Plausibly Alleged the Unions Violated Section
      8(b)(4)(ii)(B). .......................................................................... 24

      A.    Federal labor law prohibits secondary boycotts by
            labor organizations........................................................... 24

      B.    The Unions violated section 8(b)(4)(ii)(B) of the
            NLRA................................................................................. 27

            1.    The plain text of the statute supports
                  Midwest's claim. .................................................... 28

            2.    The caselaw confirms Midwest's reading of the
                  statute. .................................................................... 40

II.   The District Court's Analysis is Unpersuasive........................ 45

      A.    Midwest alleged the Unions engaged in more than
            mere picketing.................................................................... 45

      B.    The Unions' picketing was threatening, coercive,
            and restraining conduct. ................................................... 49

      C.    The District Court misread Midwest's Second
            Amended Complaint as resting on a flawed theory of
            derivative liability............................................................. 54

CONCLUSION.......................................................................................... 59

DESIGNATION OF DISTRICT COURT DOCUMENTS

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*520 S. Mich. Ave. Assocs. v. Unite Here Loc. 1,*
     760 F.3d 708 (7th Cir. 2014) ....................................... 21, 26, 51

*Ashcroft v. Iqbal,*
     556 U.S. 662 (2009) ................................................ 23, 24, 30

*Carruthers Ready-Mix, Inc. v. Cement Masons Loc. Union No. 520*
     779 F.2d 320 (6th Cir. 1985)........................................42, 43, 51

*Direct, Inc. v. Treesh,*
     487 F.3d 471 (6th Cir. 2007) ....................................18, 24, 32

*Dist. 30, UMW, & Local 1834 v. NLRB,*
     819 F.2d 651 (6th Cir. 1987) .................................................. 58

*Doe v. Miami Univ.,*
     882 F.3d 579 (6th Cir. 2018) ................................................ 23

*Duplex Printing Press Co. v. Deering,*
     254 U.S. 443 (1921).............................................................. 27

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast. Bldg. & Constr.*
*Trades Council,*
     485 U.S. 568 (1988)............................................. 46, 51, 52, 53

*F.A. Wilhelm Constr. Co. v. Ky. State Dist. Council,*
     293 F.3d 935 (6th Cir. 2002).........................................20, 42, 43, 51, 56

*Gottfried v. Sheet Metal Workers' Int'l Ass'n, Loc. Union No. 80,*
     876 F.2d 1245 (6th Cir. 1989)........................................... 43, 44

*Int'l Asso. of Bridge, etc. v. NLRB,*
     598 F.2d 1154 (9th Cir. 1979)................................................. 49

*Int'l Longshoremen's Ass'n Local 1982,*
     NLRB No. 08-CC-207613 (Oct. 10, 2017)................................15

iv

*Int'l Longshoremen's Ass'n v. Allied Int'l,*
    456 U.S. 212 (1982) ..............................................................40, 41, 42, 53

*Kitchen Fresh, Inc. v. NLRB,*
    716 F.2d 351 (6th Cir. 1983)....................................................................58

*Kroger Co. v. NLRB,*
    647 F.2d 634 (6th Cir. 1980) ...................................................................57

*Mead Corp. v. ABB Power Generation, Inc.,*
    319 F.3d 790 (6th Cir. 2003) ...................................................................59

*Meyers v. Cincinnati Bd. of Educ.,*
    983 F.3d 873 (6th Cir. 2020)................................................ 23, 24, 35, 38

*NLRB v. Denver Bldg. & Constr. Trades Council,*
    341 U.S. 675 (1951) .................................................................................49

*NLRB v. Int'l Union of Operating Eng'rs,*
    400 U.S. 297 (1971) ................................................................................53

*NLRB v. Retail Store Ems Union,*
    447 U.S. 607 (1980).......................................................................47, 50, 57

*Overstreet ex rel. NLRB v. United Bhd. of Carpenters & Joiners
of Am., Local 1506,*
    409 F.3d 1199 (9th Cir. 2005) .................................................................48

*Sandifer v. United States Steel Corp.,*
    571 U.S. 220 (2014) .................................................................................29

*Shafer Redi-Mix, Inc. v. Chauffeurs, Teamsters & Helpers Loc.
Union #7,*
    643 F.3d 473 (6th Cir. 2011)..................................20, 22, 27, 42, 47, 51, 57

*Sheet Metal Workers' Int'l Ass'n, Local 15 v. NLRB,*
    491 F.3d 429, 438 (D.C. Cir. 2007)..........................................................49

*Thompson v. Greenwood,*
    507 F.3d 416 (6th Cir. 2007) ...........................................................28, 49

*United States v. Riccardi,*
    989 F.3d 476 (6th Cir. 2021) ...................................................................31

*United Steelworkers of Al., ALF-CIO v. N.L.R.B.*,
  376 U.S. 492 (1964) ..............................................................48, 49, 50, 51

*Urban Assoc. v. Standex Elec*,
  216 F. App'x 495 (6th Cir. 2007) ............................................................ 59

*Wamer v. Univ. of Toledo*,
  27 F.4th 461 (6th Cir. 2022) ....................................................... 23, 35, 38

*Whirlpool Fin. Corp. v. Commissioner*,
  19 F.4th 944 (6th Cir. 2021) ............................................................ 28, 31

## Statutes

28 U.S.C. § 1291 ........................................................................................... 3

28 U.S.C. § 1331 ........................................................................................... 3

29 U.S.C. § 152 ........................................................................................29, 31

29 U.S.C. § 158(b) .................................................................................*passim*

29 U.S.C. § 187 ....................................................................... 3, 28, 29, 55

29 U.S.C. § 402(h) ...................................................................................... 6

46 U.S.C. § 9302 ............................................................................... 2, 8, 33

National Labor Relations Act, Pub. L. 74-198, ch. 372, 49 Stat.
  449 (1935) .......................................................................................*passim*

Labor Management Relations Act, Pub. L. 80-101, Chapter 120,
  61 Stat. 136 (1947) .............................................................................. 25, 29

Labor Management Reporting and Disclosure Act, Pub. L. No.
  86-257, 73 Stat. 519 (1959) ................................................................ 25, 32

## Regulations, Rules, and Other Authorities

46 C.F.R. § 401.500 ...................................................................................... 8

Fed. R. Civ. P. 12(b)(6) ........................................................................ 3, 23

3 Nat'l Labor Relations Act: Law & Practice § 21.02 (Mathew
  Bender, 2d ed. 2021) ................................................................................. 26

American Heritage Dictionary of the English Language (1969) ..........*passim*

Black's Law Dictionary (11th Ed. 2019)........................................... 26, 27, 48

Merriam-Webster Online, https://tinyurl.com/2y8468tm ........................ 10

Random House Dictionary of the English Language (2d ed. unabridged 1987)..............................................................................*passim*

Restatement (Second) of Agency, § 1 ........................................ 23, 29, 30, 57

## **STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Midwest requests oral argument to aid the Court in its decision-making process.  This appeal involves the interpretation of the plain language of the National Labor Relations Act, as amended, which prohibits a labor union from embroiling neutral third parties in the union's labor dispute with a primary employer where an object thereof is to force those third parties to stop doing business with the union's real target.  29 U.S.C. § 158(b)(4)(ii)(B). Midwest has alleged, however, the union defendants did just that when they trapped vessels of neutral shipping companies at sea by preventing them from docking and undocking at Midwest's port.  Misconstruing these well-pleaded facts and the governing legal standards, the District Court dismissed Midwest's complaint.  Oral argument may provide guidance on the correct application of the statute and caselaw to Midwest's detailed allegations of improper coercion.

**INTRODUCTION**

In 2016, a local affiliate of a North American labor union representing dockworkers at the Port of Toledo was in a bind. Among other things, the union had no money in the bank and was in debt. Worse, the union had failed to reach a collective bargaining agreement with one of the companies operating at the Port: Midwest Terminals of Toledo International, Inc. So the international and regional governing bodies of the labor union installed two of their officers as co-trustees of the local union. (This brief refers to these individuals and entities collectively as the "Unions.") Then the Unions came up with a new scheme designed to pressure Midwest.

The scheme worked like this: The Unions would set up sham pickets in different locations around the Port. These pickets were a sham because they were not intended to stop any of Midwest's workers from working on the dock, nor did they have that effect. The "sole purpose" of the pickets was to send a signal to a different group of workers, called shipping "pilots," whose job it was to navigate ocean-going international shipping vessels in and out of shallower Port waters. (*See* Second Amend. Compl., R.64, #488, ¶65.) The signal told these pilots to stop navigating international ships to and from the Port. That had the effect of trapping the ships in or around the Port because, under federal law, international ships require pilots to navigate

1

Port waters.  46 U.S.C. § 9302.  The goal of the scheme was to prevent international shipping companies from docking their ships at the Port, cutting off Midwest's business from those companies, and to thereby get Midwest to yield to the Unions' demands.

The scheme was effective in causing Midwest massive economic damages.  The Unions succeeded in effectively blockading the Port and preventing the international shipping companies from moving their ships at tremendous cost to those companies.  This led the shipping companies to stop doing business with Midwest, which in turn led Midwest to lose all international shipping business during this period.

The scheme was also illegal.  Section 8(b)(4)(ii)(B) of the National Labor Relations Act prohibits labor unions from "threaten[ing], coerc[ing], or restrain[ing] any person engaged in commerce" where "an object" of that conduct is "forcing or requiring" that person "to cease doing business with any other person."  29 U.S.C. § 158(b)(4)(ii)(B).  That is what the Unions did here.  They "threaten[ed], coerc[ed], or restrain[ed]," the international shipping companies by trapping the companies' ships in or around the Port. And the Unions did so with the goal of "forcing or requiring" those shipping companies "to cease doing business with" Midwest.  *Id.*  The most straightforward reading of the statutory language leads to one conclusion:

the Unions violated section 8(b)(4)(ii)(B) of the National Labor Relations Act.

Relying on inapplicable caselaw and overlooking Midwest's critical allegations, the District Court dismissed Midwest's claim. But Midwest's complaint more than adequately described the precise scheme in extensive detail. This Court should correct the District Court's error and reverse.

## JURISDICTIONAL STATEMENT

Midwest appeals from the District Court's Rule 12(b)(6) dismissal of Midwest's Second Amended Complaint. The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 187. The District Court issued its dismissal order on March 30, 2022, (R.92) and entered judgment the same day, (R.93). Midwest filed a notice of appeal on April 8, 2022 (R.95). This Court therefore has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether Midwest stated a claim under section 8(b)(4)(ii)(B) of the National Labor Relations Act when Midwest alleged a scheme in which the Unions threatened, coerced, or restrained neutral shipping companies by preventing those companies from docking or undocking their ships at the Port operated by Midwest, with an object of thereby forcing those companies to cease doing business with Midwest.

## STATEMENT OF THE CASE

**I.  Local 1982 Was Once the Certified Collective Bargaining Representative of Midwest's Workers but Lost That Status after Losing Most of the Workers' Support.**

Midwest operates the Port of Toledo—a large maritime facility that sits on the western edge of Lake Erie at the mouth of the Maumee River.  (R.64, Second Amended Complaint ("SAC"), #478, ¶1.)  (# refers to PageID#.)  Midwest employs dockworkers (or "stevedores") who load and unload shipping vessels' cargo.  (R.64, SAC, #478, ¶1.)  Local 1982 is a local affiliate of the International Longshoremen's Association labor union, also known as the "ILA."  (*Id.*, #478-79, ¶¶1-2.)  Local 1982 was once the certified collective bargaining representative of Midwest's dockworkers.  (*Id.*, ¶4.)  But that changed on January 3, 2018, after most of Midwest's dockworkers signed a petition saying they no longer wanted Local 1982 to represent them, and Midwest thereupon withdrew recognition from Local 1982.  (*Id.*)

Many years of dysfunction within Local 1982 preceded that withdrawal of recognition.  (*Id.*, ##480–81, ¶15.)  In the wake of these issues, Midwest did not renew its local collective bargaining agreement with Local 1982, which expired in 2010.  (*Id.*, #480, ¶12.)  Midwest likewise did not renew its participation in a regional collective bargaining agreement with the ILA's Great Lakes District Council after the agreement expired in 2012.  (*Id.*, ¶13.)  (The Great Lakes District Council, which this brief calls the "District

Council," is a subordinate organization within the ILA that oversees the ILA's local unions (like Local 1982) in the Great Lakes region. This brief collectively refers to the ILA, the District Council, and Local 1982 as the "Unions.") Midwest and the Unions tried to renegotiate the local collective bargaining agreement after its expiration, but those negotiations were unsuccessful. (*See id.*, ¶14.)

## II.   The Unions First Threatened Shipping Companies in 2013.

What the Unions could not do through negotiation, they tried to do through force. Around March 2013, Local 1982 and the District Council (through the presidents of both unions) threatened various shipping companies that docked their vessels at the Midwest facility located at the Port. (*Id.*, #485., ¶¶43–44.) Local 1982 and the District Council warned the shipping companies they "could expect labor trouble if their ships docked at the Toledo Port." (*Id.*, ¶43.) In response, Midwest (through its attorney) wrote a letter to the District Council and Local 1982. (*Id.*, ¶44.) The letter noted the shipping companies were neutral parties in the Unions' ongoing labor dispute with Midwest. (Ex. O, R. 64-14, #545.) As such, explained the letter, the Unions' threats were "a violation of the National Labor Relations Act." (*Id.*) The letter further warned Midwest would sue for damages if the Unions did not stop threatening the shipping companies. (*Id.*) After

Midwest sent its letter, Midwest stopped hearing about the Unions making threats against the shipping companies.  (SAC, R.64. #486, ¶46.)

**III.  After the ILA Placed Local 1982 into Trusteeship, the Unions Devised a Scheme to Pressure International Shipping Companies with the Ultimate Goal of Pressuring Midwest.**

The peace did not last.  The beginning of its end came in 2016 when the ILA placed Local 1982 into trusteeship.  (*Id*., #482, ¶24); *see also* 29 U.S.C. § 402(h) (defining "[t]rusteeship" under the NLRA).  This was the second time in recent years the ILA had placed Local 1982 into trusteeship.  (*See id*., #481, ¶16.)  The ILA did so partly because of Local 1982's failure to finalize a collective bargaining agreement with Midwest since 2010.  On top of that, all Local 1982 members, including all of the union's officers, had been delinquent in paying their dues to Local 1982.  (Ex. E*,* R.64-5 #529.)   As a result, Local 1982 itself had been delinquent in paying dues to the District Council and the ILA since November 2013.  (*Id.*)  Adding to these troubles, Local 1982 had no regularly scheduled executive board or membership meetings.  (*Id.*)  There were long delays in Local 1982's election of officers. (*Id.*)  Local 1982 had not prepared any financial reports since 2013.  And Local 1982 owed legal fees to its law firm.  (*See id.*; SAC, R.64, #481, ¶18.)

Because of these problems, the ILA placed Local 1982 into trusteeship and appointed one of the ILA's vice presidents, William Yockey, as trustee of

Local 1982 during the trusteeship.  (*Id.*, ##481–82, ¶¶18–24.)  The ILA told Yockey to take "charge and control of the books, records, property, assets, funds, and affairs" of Local 1982.  (*Id.*, #482, ¶24.)  Mike Baker, who was secretary treasurer of the District Council, joined Yockey as co-trustee of Local 1982 on December 2, 2016.  (*Id.*, #482, ¶¶25-26.)  All other officers were "removed from office and no longer ha[d] authority" over Local 1982.  (*Id.*, #482-83, ¶27.)  "Total control of Local 1982 now rested with … Yockey [and Baker] for 'all future matters between Midwest … and … [Local 1982].'")  (*Id.*; Ex. J, R.64-9, #538.)

With Yockey and Baker now in control of Local 1982, the Unions adopted a new strategy in their ongoing labor dispute with Midwest.  The Unions evidently realized they did not have enough support among Midwest's workers to disrupt Midwest's operations through a traditional picket and strike.  (*See* SAC, R.64, #479, ¶4.)  So, instead, the Unions devised a scheme involving a separate group of workers at the Port called "pilots."

Pilots are experts at navigating ocean-going shipping vessels in and out of shallow Port waters.  Although each pilot who works at the Port is an independent contractor, the pilots are affiliated with each other through an entity called Lake Pilots Association.  (*Id.*, #486, ¶¶51-52.)  Based in Michigan, the Lake Pilots Association operates in the Eastern Great Lakes

helping pair pilots with shipping vessels needing pilotage services. (*Id.*, ¶51.) Coast Guard regulations require international shipping vessels to rely on licensed pilots to navigate, dock, and undock at the Port. Without a pilot, international shipping vessels generally cannot move in or out of the Port. *See* 46 U.S.C. § 9302; *see also* 46 C.F.R. § 401.500 (R.64, 486, ¶52.). (Unlike international shipping vessels, vessels that travel only within the Great Lakes do not require assistance from a pilot to dock and undock. *See* 46 U.S.C. § 9302.)

## IV. Under the Scheme, Shipping Pilots Refused to Navigate International Ships In and Out of Port Waters Upon Seeing the Unions' Signal.

The Unions' scheme worked like this: First, some of the Unions' members would participate in either a land picket or a water picket. (*See, e.g.*, R.64, #488 ¶65; *id.*, #492, ¶102.) The picket *itself* did not directly affect Midwest's operations. Instead, the real "purpose" and "intent" of the picket was to "force" international ships "to stop doing business with Midwest" by trapping them in the Port. (*See, e.g.*, *id.*, #488, ¶65, #495, 130-133.) The picket did so by serving as a *signal* to the pilots to not do their jobs and gave the pilots an *excuse* for not doing so. (*See, e.g.*, *id.*, #488, ¶65.) The pilots who worked at the Port had an express or implied agreement with the Unions. (*See, e.g.*, *id.*) Under that agreement, the pilots would *refuse* to

8

navigate international ships in and out of the Port upon seeing the Unions' picket. (*See, e.g.*, *id.* ¶67.) The pilots would pretend to blame the Unions' sham picket as the reason the pilots could not navigate the ships. (*See, e.g.*, *id.*)

The Unions' scheme, which played out between 2017 and 2018, repeatedly "held hostage" the international ships. (*See id.*, ##488–498, ¶¶64–155.) It was simple but highly effective in (1) blocking various international shipping companies' vessels at the Port (*id.*) and (2) causing Midwest "massive" economic damages (*id.*, #498, ¶156.).

## V.    The Unions Conducted Eight Blockades Between 2017 and 2018 that Trapped International Shipping Vessels In or Around the Port.

The first of these blockades occurred on April 25, 2017. The Unions' targets that day were two ships owned by FedNav. (*See id.*, #488, ¶64.) (FedNav is "the largest [i]nternational [s]hipping [c]ompany headquartered in Canada." (*Id.*)) One ship was trying to undock from the Port and another was trying to dock at the Port. (*Id.*) Neither ship got to where it wanted to go. The Unions had set up a "fake 'picket'" for the "sole purpose" of giving the pilots "an excuse [to] not … move the ships." (*Id.*, ¶65)

This picket was not "close to Midwest's main gate entrance," like one might expect from a typical picket. (*Id.*, #489, ¶71.) It was located "about a

mile away from the Midwest dock." (*Id.*, #489, ¶71)  All of Midwest's employees, including employees who were Local 1982 members, "crossed this fake 'picket.'" (*Id.*, #488, ¶66)  (In labor parlance, to "cross" a picket line means to work despite the picket.  *See* cross the picket line, Merriam-Webster Online, https://tinyurl.com/2y8468tm.)  The only individuals who chose to not work were the pilots FedNav needed to navigate their ships in and out of the Port.    (SAC, R.64, #488-89, ¶¶67-68.)  The Unions "coordinated" with the pilots to ensure they followed the scheme. (*Id.*, #489, ¶68.)  As a result, FedNav's ships could not enter or leave the Port.  (*Id.*, #488, ¶64.)

Two days later, Yockey (on behalf of the Unions) attended a meeting with the Toledo-Lucas County Port Authority.  At that meeting, Yockey "admitted that … Local 1982 had blocked the ships at the … Port." (*Id.*, #489, ¶72.)  Yockey further admitted, "his goal was to have these … shipping companies abandon [their] cargo at Midwest."  (*Id.*)  Consistent with that goal, Yockey warned the Unions would "engage in additional coordinated actions with the LPA Pilots to stop future ships."  (*Id.*, #490, ¶75.)  It was impossible for Local 1982 to block any ships from docking or undocking, as Yockey boasted doing, without colluding with the pilots.  (*Id.*, ¶73.)

True to Yockey's word, the Unions set up sham pickets again in late October and early November.  For the November picket, Midwest set up a "reserved gate system" to eliminate any doubt about the pilots' ability to access ships.  (*Id.* #491, ¶87.)  Essentially, Midwest designated one area (or "gate") of the Port for the Unions' planned picket and another area of the Port for the pilots' access to the ships.  (*Id.*)  But when the picketing began, the Unions picketed outside the designated area.  (*Id.*, ¶88.)  Still, no Midwest employee had trouble working despite the picket.  But the pilots once again used the picketing as cover for failing to navigate a ship that was stuck at the Port.  (*See id.*, ¶92.)

This pattern of fake picketing, colluding pilots, and blocked vessels continued later that month, on November 22, 2017, and again on April 8, 2018.  On April 8, the Unions set up pickets not only on land but also on water.  (*Id.*, #492, 101–02.)  The water picket featured a boat on water picketing directly at shipping vessels entering the river leading to the Port.  (*Id.*, ¶102.)  Yockey himself "used his pontoon boat to go out onto [the] waters and 'picket' neutral ships" during the day and night.  (*Id.*, #493, ¶105.)  Yet again, the picket's purpose was to signal the pilots to not navigate ships entering or leaving the Port.  (*Id.*, #492, ¶104.) While picketing on the water,

11

Yockey even contacted the pilots by radio, reminding them to "abide by their agreement" to not navigate ships, and the pilots complied. (*Id.*, #493, ¶106.)

Yet again, the Unions succeeded in trapping ships at or outside the Port. In so doing, the Unions "knew and understood that the intent of their actions were to force or require" international shipping companies to stop doing business with Midwest. (*Id.*, ¶107)

The Unions carried out their scheme again on May 2, 2018. (*See id.*, #493.) That picket, like the pickets before, did not stop a single Midwest employee from doing his or her job. (*Id.*, #494, ¶116.) But the picket worked as a signal for a particular pilot who, upon seeing the picket, "refused to dock a ship" at the Port. (*Id.*, #493, ¶109.) Relying on the picketing as his excuse, the pilot instead "moved the ship out of the channel" before the pilot departed northeast back to Lake Erie. (*Id.*, ¶110.) "The ship did not return until the following day, May 3, 2018." (*Id.*, ¶111.) "When it did return, the Pilot once again refused to dock the ship." (*Id.*, ¶112.) At that point, the captain of the ship "called for tugs to dock the ship," which the tugs managed to do. (*Id.*, ¶¶113–14.) But when the ship was "unloaded and scheduled for departure on May 6, 2018," the pilot once again "refused to move the ship." (*Id.* ¶115.)

12

The pattern continued on May 10, 2018.  (*Id.*, #494.)  The Unions relied again on both land and water picketing to signal the pilots.  (*Id.*, ¶122.)  The Unions succeeded in trapping another ship so, including the ship still trapped from May 6, there were now two ships trapped at Midwest's dock. (*Id.*, ¶121.)

The last blockade occurred two days later on May 12, 2018.  (*Id.*, #494) As they did on May 10, the Unions this day used land and water pickets to signal the pilots.  (*Id.*, #495, ¶127.)  Seeing the Unions' cue, a pilot refused to move an unloaded ship that he had docked at the Port the night before.  (*Id.*, ¶128.)  Thus, adding the two ships the Unions trapped at the Port two days earlier, the Unions now had *three* ships trapped at the Port.  (*Id.*, ¶129.)

The situation became so desperate that Senator Robert Portman called on the United States Coast Guard to seek a regulatory workaround the problem.  (*See* Ex. P, R.64-15, #548.)  The next day, May 13, 2018, Yockey issued a press release denouncing Senator Portman's attempt to "[i]ntervene in the ongoing Labor Dispute between the International Longshoremen's Association and Midwest Terminals Inc. in the Port of Toledo."  (*Id.*)  Yockey quarreled especially with Senator Portman's request of the Coast Guard to waive its regulations requiring international shipping vessels to rely on pilots in docking and undocking at the Port.  (*Id.*)  In the same press release, Yockey

acknowledged the requirements had been instrumental in "trapp[ing]" "three foreign flag vessels … in the port for over a week." (*Id.*)  And Yockey boasted the "vessels ha[d] created a bottleneck that have delayed other ships from entering the port." (*Id.*)  Yockey's press release was thus another public admission the Unions had orchestrated the blockades at the Port for the past several months because of the Unions' "ongoing Labor Dispute" with Midwest. (*Id.*)

The three vessels remained trapped at the Port "for approximately two weeks before Midwest and the shipping companies were able to secure permission from the Coast Guard to have the ships moved without a [p]ilot." (SAC, R.64 #496, ¶135.)  This blockade was a turning point in the saga of the Unions' scheme.  "[A]s a direct result" of the blockade, "Midwest lost all international [s]hipping [b]business from" May 2018 until October 2018. During that time, Midwest "suffered massive amounts of damage." (*Id.*, ¶¶137–38.)  The shipping vessels only began to return in October after the Coast Guard "prohibited" the pilots "from coordinating with" the Unions to block the shipping companies' vessels. (*Id.*, ¶137.)

## VI. Midwest Initially Sought Relief from the NLRB.

Midwest first sought injunctive relief with the National Labor Relations Board—the "NLRB"—against *some* of the conduct discussed above.

(*See Int'l Longshoremen's Ass'n Local 1982*, NLRB No. 08-CC-207613 (Oct. 10, 2017) (docket publicly available at https://www.nlrb.gov/case/08-CC-207613.) But in a scarcely reasoned letter that addressed the substance of Midwest's allegations in just two paragraphs, the NLRB's regional director found no violation of federal labor law. (*See* Docket Entry 12/29/2017.) Then, in a one paragraph letter that essentially adopted the reasoning of the regional director's letter, the NLRB's general counsel affirmed the decision of the regional director. (*See* Docket Entry 10/09/2018.)

## VII. Midwest Next Sought Relief in Federal Court, and the District Court Eventually Dismissed Midwest's Claim.

Midwest concluded that if it were to obtain any relief from the Unions' blockades, Midwest would have to file suit in federal court. So Midwest filed this lawsuit seeking money damages against the Unions in the Northern District of Ohio. (*See* Compl., R.1.) At the District Court, Midwest twice amended its complaint. (*See* Amend. Compl, R.10; Sec. Amend. Compl., R.64.) The Unions, in turn, moved to dismiss Midwest's Second Amended Complaint. (*See* ILA's Mot. To Dismiss, R.75; Local 1982 and District Council's Mot. To Dismiss, R. 77.)

During the motion-to-dismiss briefing, Midwest pressed multiple alternative theories of recovery based on different combinations of statutory

provisions under 29 U.S.C. § 158(b)(4).  Ultimately, these claims fell into two buckets.

The first bucket of claims are known as "hot-cargo" claims and arise under subparagraph (A) of 29 U.S.C. § 158(b)(4).  Subparagraph (A) prohibits any labor union or its agents from engaging in specific conduct with the intention of "forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by [subsection (e)]."  Subsection (e), in turn, prohibits contracts or agreements in which an employer "refrains or agrees to … refrain" from "dealing in any of the products of any other employer."

The second bucket of claims arise under subparagraph (B) of 29 U.S.C. § 158(b)(4).  (At the District Court, Midwest also called these claims "secondary-picketing" claims below.  (SAC, R.64, ##497–99.))  Subsection (B) prohibits any labor union from engaging in certain conduct with the purpose of "forcing or requiring any person to … cease doing business with any other person."

The District Court dismissed all of Midwest's claims under Rule 12(b)(6), holding that Midwest failed to plausibly allege a violation of either a secondary-boycott claim or a hot-cargo agreement.  (Op. & Order, R.92, #746.)  Now, on appeal, Midwest focuses on its secondary-boycott claim

under 29 U.S.C. § 158(b)(4)(ii)(B).  In this brief, Midwest explains how the Unions violated this provision by "threaten[ing], coerc[ing], or restrain[ing]" shipping companies with "an object"of "forcing or requiring" the companies to "cease doing business" with Midwest.  *Id.*  It was error for the District Court to dismiss this claim, and this Court should reverse.

## SUMMARY OF ARGUMENT

Statutory text and caselaw point to the same conclusion:  Midwest plausibly alleged the Unions violated section 8(b)(4)(ii)(B) of the National Labor Relations Act.

Begin with the text.  Section 8(b)(4)(ii)(B) prohibits Unions from "threaten[ing], coerc[ing], or restrain[ing] any person engaged in commerce" with "an object" of "forcing or requiring" that person "to cease doing business with any other person."  29 U.S.C. § 158(b)(4)(ii)(B).  The Unions did exactly that:  they "threaten[ed], coerc[ed], or restrain[ed]" international shipping companies by trapping those companies' ships in or around the port with the "an object" of "forcing or requiring" those companies "to cease doing business" with Midwest.  Indeed, Midwest plausibly alleged the Unions threatened, coerced, *and* restrained the shipping companies.  That follows from the plain and ordinary meaning of "threaten," "coerce," and "restrain."

Back in 1959, when Congress enacted section 8(b)(4)(ii)(B) into law, each of these terms basically meant what they mean today. In brief, "restrain" meant (and means): to "control; check; [and] repress." American Heritage Dictionary of the English Language 1109 (1969). "Coerce" meant: to "force to act or think in a given manner; to compel by pressure or threat." *Id.* at 258. And "threaten" meant: "to express a threat against." *Id.* at 1340. ("Threat," in turn, meant an "expression of an intention to inflict pain, injury, evil, or punishment on a person or thing." *Id.*).

Drawing "all reasonable inferences" in Midwest's favor, *Direct, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007), Midwest alleged more than enough facts to show the Unions "restrain[ed]," "coerc[ed]," and "threaten[ed]" the shipping companies, § 158(b)(4)(ii). Through more than twenty pages of allegations and forty pages of exhibits, Midwest detailed a scheme in which the Unions would "control" the movement of shipping companies' vessels by deciding *which* ships could enter and leave the Port and *when*. American Heritage Dictionary at 1109. By preventing the ships from either docking or undocking at the Port through their sham picketing scheme, the Unions "restrain[ed]" the shipping companies. *Id.*

The Unions *also* "coerce[d]" the shipping companies. § 158(b)(4)(ii). The Unions "force[d]" the shipping companies to *do something* the

companies did not want to do (i.e. "to act in a given manner") when the Unions either "forc[ed]" the companies' vessels to stay in the Port when the vessels wanted to leave or "forc[ed]" the vessels to stay out of the Port when they wanted to enter. American Heritage Dictionary at 258. Indeed, eventually, the Unions "forc[ed]" the shipping companies to stop using the Port altogether under "threat" of further disruptions to the companies' operations. *Id.*

The Unions "threaten[ed]" the shipping companies, too. § 158(b)(4)(ii). Each blockade was an "expression of the" Unions' "intention to inflict" economic "pain, injury, evil, or punishment" on shipping vessels should ships again try to dock at the Port. American Heritage Dictionary at 1340. Said another way: the blockades were "[a]n indication of impending danger or harm." *Id.*

In forcibly targeting the shipping companies, the Unions acted with the "object" of "forcing or requiring" the shipping companies "to cease doing business with" Midwest. 29 U.S.C. § 158(b)(4)(ii). Midwest alleged, in detail, how the Unions went about accomplishing this goal—by conducting no less than *eight* separate blockades between 2017 and 2018. All told, the ordinary meaning of the statutory language shows Midwest pleaded more

than enough facts to plausibly allege the Unions violated section 8(b)(4)(ii)(B) of the NLRA.

This Court's caselaw confirms Midwest's reading of the statute. As this Court has said, a union violates section 8(b)(4)(ii)(B) when the union "brings economic pressure to bear on a 'primary employer' to do something the union wants … by inducing a 'secondary employer' doing business with the primary employer to bring economic pressure on the primary employer." *Shafer Redi-Mix, Inc. v. Chauffeurs, Teamsters & Helpers Loc. Union #7* ("*Shafer*"), 643 F.3d 473, 477 (6th Cir. 2011) (alteration original) (quoting *F.A. Wilhelm Constr. Co. v. Ky. State Dist. Council* ("*Wilhelm*"), 293 F.3d 935, 938 (6th Cir. 2002)). So "when a union has a problem with the 'primary' employer, it must focus its activities on that employer only." *Wilhelm*, 293 F.3d at 940. What the union cannot do is "exert pressure, whether direct or indirect, on other neutral or unrelated 'secondary' employers." *Id.*

The Unions did exactly what this Court said they could not do. The Unions had a "problem" with Midwest. *Id.* But rather than "focus [their] activities on" Midwest, the Unions "exert[ed] pressure … direct[ly] … on … neutral" shipping companies by trapping those companies' ships in and around the Port. *Id.* So, here, precedent and text are in sync: they both show Midwest plausibly alleged the Unions violated section 8(b)(4)(ii)(B).

The District Court dismissed Midwest's claim in two short paragraphs for two reasons.  Neither reason is persuasive.

*First*, the District Court reasoned "the mere fact that" the Unions "engaged in picketing – whether real or 'fake,' as Midwest alleges … does not plausibly suggest" the Unions "'threaten[ed], coerce[d], or restrain[ed] any person.'"  (Op. & Order, R.92, #740.)  But Midwest alleged the Unions engaged in more than "mere … picketing."  Midwest alleged a scheme in which the picket had as its "intent" and "sole purpose" (SAC, R.64, #488, 495, ¶¶65, 130)—or at least as "*an* object," §158(b)(4)(ii)—the trapping of international shipping companies' vessels with the goal of stopping the companies from doing business with Midwest.

The picketing was not intended to *persuade* the shipping companies an give them a choice.  Instead, the picketing functioned as a *signal* to the pilots under a *pre-determined agreement* with the purpose and effect of trapping the shipping companies' boats.  In doing so, the Unions intentionally targeted the shipping companies and coerced them to cease doing business with Midwest.  But "coercion against neutral parties is forbidden" under the Act, *520 S. Mich. Ave. Assocs. v. Unite Here Loc. 1*, 760 F.3d 708, 719 (7th Cir. 2014), as Congress chose to protect "neutral

employers and employees from the labor disputes of others," *Shafer*, 643 F.3d at 478.

*Second*, according to the District Court, Midwest's claim "rest[ed] on a theory of derivative liability." (Op. & Order, R.92, #741). In the District Court's view, "Defendants asked the Pilots, and the Pilots agreed, to do something which Defendants were not permitted to do themselves and, therefore, Defendants should be held liable." (*Id.*) The problem with that theory, reasoned the District Court, was that "Midwest offer[ed] no basis on which Defendants may be deemed to have undertaken the actions of an unaffiliated third party." (*Id.*)

The District Court's reasoning is unpersuasive for several reasons. To start, nobody denied (not even the District Court) that Yockey and Baker *were* the Unions' agents and the Unions were therefore responsible for Yockey's and Baker's actions. *See* 29 U.S.C. § 158(b) (holding Unions liable for their agents' conduct). Likewise, no one disputed that the members of Local 1982 who participated in the pickets were operating as agents of the Unions. (*See, e.g.*, SAC, R.64, ##488–89, 91 ¶¶64-65, 87.) It was the *Unions* (through Yockey, Baker, along with other participating members of Local 1982) who orchestrated and implemented the entire scheme of setting up pickets, signaling the pilots, and blockading the ships. So Midwest need not

rely on attributing the *pilots'* conduct to establish the Unions' liability. Midwest can rely solely on the *Unions'* conduct.

Midwest also plausibly alleged the pilots were the Unions' agents. *See* Restat. 2d of Agency, § 1 (defining "agent" as someone who acts on another's behalf, subject to the other's control and consent). By agreeing to obey, and actually obeying, the Unions' signal to not navigate international ships, the agents were "act[ing] on" the Unions' "behalf, subject to" the Unions' consent. The pilots were therefore the Unions' agents, and the Unions are liable for their conduct.

This Court should correct the District Court's errors and reverse.

## <u>STANDARD OF REVIEW</u>

This Court reviews de novo a district court's decision to dismiss a claim under Fed. R. Civ. P. 12(b)(6). *Doe v. Miami Univ.*, 882 F.3d 579, 588 (6th Cir. 2018). To avoid dismissal, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2009). A claim that is plausible raises a right to relief that is more than "speculative." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 466 (6th Cir. 2022) (quoting *Twombly*, 550 U.S. at 555). It is also more than a "sheer possibility." *Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873,

880 (6th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But "it is not akin to a probability." *Id.* Rather, a claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678.

In evaluating plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Direct, Inc.*, 487 F.3d at 476. Along with the complaint, the Court may also review any "exhibits attached to the complaint." *Meyers*, 983 F.3d at 880.

## ARGUMENT

### I. Midwest Plausibly Alleged the Unions Violated Section 8(b)(4)(ii)(B).

#### A. Federal labor law prohibits secondary boycotts by labor organizations.

Congress passed the National Labor Relations Act in 1935 with the stated goal of diminishing "strikes and other forms of industrial strife or unrest" that have as their "intent" or "necessary effect" the "burdening or obstructing [of] commerce." NLRA, Pub. L. 74-198, ch. 372, 49 Stat. 449, 449 (1935). To that end, the NLRA recognized a host of worker rights, including the right to form and join labor unions and the right to bargain collectively through elected representatives. 49 Stat. at 452. The NLRA also

prohibited certain activities by employers, deemed "unfair labor practices," that undermined those rights. *Id.*

As time passed, Congress also sought to reduce sources of industrial strife stemming from practices of labor organizations that interfered with the free flow of commerce. So twelve years after passing the NLRA, Congress passed the Labor Management Relations Act, also known as the "Taft-Hartley Act." *See* LMRA, Pub. L. 80-101, Chapter 120, 61 Stat. 136 (1947).

Congress amended the NLRA through the Taft-Hartley Act to ensure labor organizations, employees, and employers "all recognize under law that" none "has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest." Taft-Hartley Act, Section 1, 61 Stat. 136. With that goal in mind, the Taft-Hartley Act enumerated several "unfair labor practices" that labor unions were known to engage in and prohibited labor unions from engaging in those practices. LMRA, §8(b), 61 Stat. 136, 141. The NLRA now had statutory language proscribing certain union conduct to match the list of proscribed employer conduct Congress enacted twelve years earlier. Congress later refined and added to the NLRA's list of prohibited union conduct through the Labor Management Reporting and Disclosure Act, Pub. L. No. 86-257, 73 Stat. 519, 542–43 also known as the "Landrum-Griffin Act." Today, this

list of prohibited union activity is in Section 8(b) of the NLRA, as amended by the Taft-Hartley and Landrum-Griffin Acts, and codified at 29 U.S.C. § 158(b).  (Unless noted otherwise, all references to the NLRA are to the current version as amended).

One unfair labor practice the NLRA prohibits—the practice at issue in this appeal—is the secondary boycott.  *See* 29 U.S.C. § 158(b)(4).  A "boycott" is an "action designed to achieve the social or economic isolation of an adversary."  Boycott, Black's Law Dictionary 230 (11th Ed. 2019).  In the context of federal labor law, a *secondary* boycott is generally a scheme in which a labor union hopes to influence someone (almost always a business or employer with which the union has a dispute) by exercising some sort of economic or social pressure on a *third party* who deals with the entity with which the labor union has a dispute.  *See* 3 Nat'l Labor Relations Act: Law & Practice § 21.02 (Mathew Bender, 2d ed. 2021).   The employer the union hopes to ultimately influence is called the "primary" employer.  The other party the union applies economic or social pressure against (in order to influence their relationship with the primary employer) is called the "secondary" employer—hence the name, "secondary boycott."  *See id.*

(Note:  The label "secondary picketing" is often used interchangeably with "secondary boycott" because one traditional, though not exclusive, way

26

a union can apply economic and social pressure against a secondary employer is through picketing.  *See 520 S. Mich. Ave.*, 760 F.3d at 720.  "Picketing" is generally defined as the "demonstration by one or more groups outside a business or organization to protest the entity's activities or policies and to pressure the entity to meet the protesters' demands."  Picketing, Black's Law Dictionary 1386 (11th Ed. 2019)).

While the NLRA authorizes a *primary* boycott—a boycott directed toward the *primary* employer—the NLRA outlaws certain secondary boycotts.  *See* § 158(b)(4)(B).  This primary versus secondary distinction is often the dividing line between legal and illegal union conduct.  *See infra* 30–34.  That line reflects federal law's long-held understanding that secondary boycotts raise heightened antitrust concerns largely absent from primary boycotts, *see, e.g.*, *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 466 (1921), and embroil neutral third parties in the labor disputes of others, *Shafer*, 643 F.3d at 478.

## B.    The Unions violated section 8(b)(4)(ii)(B) of the NLRA.

Several provisions address secondary boycotts in the NLRA, but the statute at issue in this appeal—the statute the Unions violated—is section 8(b)(4)(ii)(B) of the NLRA, codified at 29 U.S.C. § 158(b)(4)(ii)(B).

The relevant portion of the statute says:

(b) It shall be an unfair labor practice for a labor organization or its agents—

...

    (4) ... (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where ... an object thereof is—

        ...

        (B) forcing or requiring any person ... to cease doing business with any other person ... .

Section 303 of the NLRA, codified at 29 U.S.C. § 187, authorizes a private damages suit for "[w]hoever" is "injured in his business or property" by "any labor organization" that violates "section 8(b)(4) of the National Labor Relations Act," including section 8(b)(4)(ii)(B).

In its Second Amended Complaint, Midwest plausibly alleged the Unions violated section 8(b)(4)(ii)(B) of the NLRA. That follows from the plain language of the statute and governing caselaw.

    1.   <u>The plain text of the statute supports Midwest's claim.</u>

"When interpreting statutes, the language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *Thompson v. Greenwood*, 507 F.3d 416, 419 (6th Cir. 2007) (quotation omitted). Courts "construe statutory text as it would have been understood 'at the time Congress enacted the statute.'" *Whirlpool Fin. Corp. v. Commissioner*, 19 F.4th 944, 950 (6th Cir. 2021) (quoting *Wisconsin Cent. Ltd. v. U.S.*, 138 S. Ct 2067, 2070 (2018)). Here,

that "ordinary, contemporary, common meaning," *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014), compels one conclusion—Midwest adequately alleged the Unions violated section 8(b)(4)(ii)(B).

> (a)    The Unions are "labor organizations" under the NLRA and Yockey and Baker were the Unions' agents.

Begin with subparagraph (b).   It is undisputed the Unions are "labor organization[s]" within the NLRA's definition of that term.   *See* 29 U.S.C. § 152(5).  And under section 303 (29 U.S.C. § 187) and section 8(b) (29 U.S.C. § 158(b)) of the NLRA, each of the Unions can be held responsible for not just their actions but also for the actions of their "agents."

Midwest plausibly alleged Yockey and Baker and Local 1982 members who orchestrated and participated in the blockades from 2017 to 2018 acted as the agents of each of the Unions.   *See* Restatement (Second) of Agency, § 1 (defining "[a]gency" as a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act").  Midwest alleged, for example, the ILA appointed Yockey and Baker as co-trustees of Local 1982.  At the time of their appointments, Yockey was an ILA vice president and Baker was secretary treasurer of the District Council.  (SAC, R.64, #481, ¶19; *id.* #482, ¶26.).  Both remained in those positions

while serving as co-trustees of Local 1982. (SAC, R.64, #481, ¶20; *Id.*, #483, ¶28.) As co-trustees of Local 1982, Yockey and Baker made all of the key decisions for Local 1982 while the ILA and District Council "oversaw" Yockey and Baker's activities. (*Id.*, #484, ¶36.). The ILA and the District Council also lent support and resources to Yockey and Baker so that Local 1982 could continue "fighting" Midwest. (Ex. L, R.64-11, #540; *see also* Ex. K, R.64-10, #539 (email from Yockey to ILA and District Council officers titled "Send Lawyers Guns and Money" and attaching a Local 1982 trusteeship report).) The participating members of Local 1982, meanwhile, followed the orders of Yockey and Baker (and ultimately the Unions themselves) by picketing when and where the Unions wanted them to for purposes of effecting the scheme. (SAC, R.64, ##488–496.)

The "reasonable inference," *Iqbal*, 556 U.S. at 678, from these points is that Yockey, Baker, and the participating Local 1982 members acted with the "consent" of and "on … behalf" of each of the Unions, subject to the Unions' "control," Restatement (Second) of Agency, § 1. Thus, Yockey, Baker, and the participating Local 1982 members were *plausibly* the Unions' agents and the Unions *plausibly* were responsible for these individuals' actions. *See* 29 U.S.C. § 158(b)(4).

> (b)    The Unions threatened, coerced, or restrained the shipping companies.

The next relevant line of statutory text is in subparagraph (ii). Subparagraph (ii) states the labor union or its agents may not "threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce." 29 U.S.C. § 158(b)(4)(ii). In Midwest's Second Amended Complaint, the "person[s]" referenced in subparagraph (ii) are the shipping companies who attempted (and failed) to dock or undock their vessels at the Port. *See* 29 U.S.C. § 152(1) (defining a "person" under the NLRA to include "one or more individuals … partnerships, associations, [or] corporations"). No dispute there. Nor is there any dispute the shipping companies were engaged "in commerce or in an industry affecting commerce." *See* § 152(6)–(7) (defining "commerce" and "affecting commerce" under the NLRA). What *is* in dispute is whether Midwest *plausibly* alleged the Unions "threaten[ed], coerce[d], or restrain[ed]" the shipping companies. § 158(b)(4)(ii). The answer is a resounding "yes."

Start with "restrain." The NLRA does not define "restrain," so the Court should give the term its "ordinary meaning" as understood at the time of the text's enactment. *See United States v. Riccardi*, 989 F.3d 476, 488 (6th Cir. 2021) (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)); *Whirlpool*, 19 F.4th at 950. The American Heritage Dictionary of

31

the English Language (1969) provides three definitions for "restrain": "1. To control; check; repress.  2.  To deprive of freedom or liberty.  3. To limit or restrict."  *Id.* at 1109; *see also* The Random House Dictionary of the English Language 1642 (2d ed. unabridged 1987) (similar); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 423 (recommending both dictionaries as among the "most useful and authoritative for the English language generally and for law").  (Note: the relevant statutory text here was either enacted or re-enacted into law in 1959 through the Landrum-Griffin Act, Pub. L. No. 86-257, 73 Stat. 519, 542–43. So the above dictionaries are roughly contemporaneous with the statutory text.)

"Constru[ing] the complaint in the light most favorable to" Midwest, *Direct, Inc.*, 487 F.3d at 476, Midwest alleged more than enough facts to show the Unions' "restrain[ed]" the shipping companies, § 158((b)(4)(ii). Recall that in its Second Amended Complaint, Midwest alleged an implied or express agreement in which the Unions would set up sham pickets when the international shipping vessels were preparing to either dock or undock at the Port.  Under the agreement, pilots would refuse to navigate these ships when they saw the Unions' pickets.  Because everyone agrees federal law generally required (and still requires) international ships to rely on pilots when

32

navigating Port waters, 46 U.S.C. § 9302, the scheme effectively prevented the ships from entering or leaving the Port.

Through this scheme, the Unions "control[led]" the movements of the shipping companies' vessels. American Heritage Dictionary 1109. The Unions decided, for example, *which* ships could enter or leave the Port and *when* those ships could enter and leave by signaling the pilots to withhold pilotage services. (SAC, R.64, ##488–496.) The Unions "repress[ed]" the ships they targeted by preventing the ships from docking or undocking at the Port. American Heritage Dictionary 1109. In doing so, the Unions "deprive[d]" the shipping companies the "freedom" or "liberty" to move the companies' vessels freely within the Port. *Id.* In other words, the Unions "restrict[ed] or limit[ed]" the shipping companies' movements at the Port. *Id.* It follows the Unions "restrain[ed]" the shipping companies. *Id.*

Midwest did more than just describe the Unions' general scheme, too. Through twenty-two pages of allegations and forty-six pages of exhibits, Midwest provided *details* of the scheme. Midwest recounted, for example, no less than *eight* episodes (with exact dates) during which the Unions, working with the pilots, prevented the ships from either docking or undocking at the Port. For most of these episodes, Midwest alleged specific facts explaining how the Unions' scheme played out on a particular day.

33

Take just the three incidents in May 2018, when the Unions relied on land and water pickets to signal the pilots. (*Id.*, ##493–496.) During the first incident, a ship had to call for tugs after a pilot refused to dock the ship. (*Id.*, #493, ¶¶113–14.) When the ship was supposed to leave four days later, the pilot, following the Unions' signal, again refused to move the ship, trapping the ship in the Port. (*Id.*, ¶115.) Midwest then alleged how, six days after that, the Unions signaled a pilot to not move another ship from the dock, trapping a second ship at the Port. (*Id.*, #494, ¶¶120-21.) Two days later, the Unions signaled the pilots yet again to not move a ship. Along with the two other ships already trapped at the Port, there were now *three* ships trapped at the Port. (*Id.*, #495, ¶¶128–29.) Were that not enough, Midwest alleged that Yockey took credit for these blockades in a press release he issued the next day, and Midwest attached that press release as an exhibit to its Second Amended Complaint. (Ex. P, R.64-15, #548.) Midwest further alleged that all three ships remained trapped at the Port "for approximately two weeks" until the Coast Guard intervened. (SAC, R.64, #496, ¶¶135–37.) These blockades, alleged Midwest, ultimately caused the shipping companies to avoid the Port entirely for several months. (*Id.*, ¶¶138.)

The May 2018 allegations, like so many of the other allegations in the Second Amended Complaint, contain a wealth of relevant, well-pleaded

facts.  These facts push Midwest's claim that the Unions "restrain[ed]" the shipping companies, § 158(b)(4)(ii), beyond the mere "possib[le]" or "speculative" and through the plausibility threshold.  *Wamer*, 27 F.4th at 466; *Meyers*, 983 F.3d at 880.

Midwest likewise alleged more facts than necessary to plausibly allege the Unions "coerce[d]" the shipping companies.  § 158(b)(4)(ii).  When Congress enacted section 8(b)(4)(ii) of the NLRA into law, the ordinary meaning of "coerce" was (much as it is today):  "To force to act or think in a given manner; to compel by pressure or threat.  2.  To dominate, restrain, or control forcibly.  3. To actualize by force."  American Heritage Dictionary at 258; *see also* Random House Dictionary at 398.

Midwest's allegations fit like a glove with the ordinary meaning of "coerce."  The Unions "force[d]" the shipping companies to "act" both (1) when the Unions (working with the pilots) prevented the companies' ships from leaving the Port and (2) when the Unions prevented the companies' ships from docking at the Port.  American Heritage Dictionary at 258.  In both instances, the Unions "force[d]" the companies to *do something* they did not want to do (i.e. "to act")—whether that was forcing the companies' ships to stay in the Port when they wanted to leave, or forcing the companies' ships to remain outside the Port when the ships wanted to enter.  *Id.*

Remember, too, Midwest alleged the Unions' conduct forced *all* international shipping companies to stop even *trying* to use the Port as a place to dock their ships and unload cargo. (SAC, R.64, #496, ¶¶135–38.) This occurred after the three especially egregious incidents in May 2018. (*Id.*) From then until October 2018, under "threat" (see definition below) of further blockades, the international shipping companies were compelled to avoid the Port entirely. (*Id.*) This was yet another instance of "coerc[ion]" alleged in the Second Amended Complaint. The ships only returned after the Coast Guard "prohibited" the Unions "from coordinating with the" pilots to stop trapping ships. (SAC, R.64, #496, ¶137.)

Next, consider "threaten" in 29 U.S.C. § 158(b)(4)(ii). When Congress enacted subparagraph (ii) into law, "threaten" meant: "1. To express a threat against. 2. To serve as a threat to; endanger; menace. 3. To give signs or warning of; portend. 4. To express threats of danger or other harm." American Heritage Dictionary at 1340; *see also* Random House Dictionary at 1975. "Threat," in turn, meant: "1. An expression of an intention to inflict pain, injury, evil, or punishment on a person or thing. 2. An indication of impending danger or harm. 3. A person, thing, or idea regarded as a possible danger; a menace." American Heritage Dictionary at 1340; *see also* Random House Dictionary at 1975.

36

Midwest pleaded more than enough facts to plausibly allege the Unions "threaten[ed]" the shipping companies.  Each blockade was an "expression of the" Unions' "intention to inflict" economic "pain, injury, evil, or punishment" on shipping companies should they again attempt to dock their ships at the Port.  American Heritage Dictionary at 1340.  Or, put differently, the blockades were "[a]n indication of impending danger or harm." *Id.*  The "danger," of course was the possibility the Unions would trap the companies' costly assets, essential for their operations, for weeks on end.  *Id.*  And Midwest alleged how, between 2017 and 2018, that "danger" became reality many times over.  (SAC, R.64, ##488–498, ¶¶64–155.)

If there were any doubt these blockades were meant to "portend" further "pain, injury, evil, or punishment," American Heritage Dictionary at 1340, the Unions went out of their way to extinguish those doubts.  When meeting with the Port Authority on April 27, 2017, for example, Yockey admitted, "his goal was to have these neutral shipping companies abandon the cargo at Midwest."  (SAC, R.64, #489, ¶72.)  Yockey surely knew the shipping companies would learn of this "goal" because his "*stated* intent at this meeting was to force or require" the shipping companies "to stop doing business with Midwest."  (*Id.*, #490, ¶76 (emphasis added).)  Yockey's press release in May 2018 was yet another "threat" on behalf of the Unions toward

37

the shipping companies.  In the statement, Yockey essentially admitted the Unions' scheme was responsible for "trapp[ing]" three ships "in the port for over a week" and "creat[ing a bottleneck that [had] delayed other ships from entering the port."  (Ex. P, R.64-15, #548.)  By publicly boasting about the Unions' responsibility for these blockades, Yockey made his "intention" plain:  to "warn[]" other ships thinking of docking at the Port that if they did so, American Heritage Dictionary at 1340, they risked embroiling themselves in the Unions' "ongoing Labor Dispute" with Midwest and seriously disrupting their operations (Ex. P, R.64-15, #548).

The upshot is that Midwest exceeded what it needed to support a *plausible* inference the Unions "threaten[ed], coerce[d], *or* restrain[ed]" the shipping companies. 29 U.S.C. § 158(b)(4)(ii)(B) (emphasis added).  Indeed, although it was unnecessary for Midwest to do so, Midwest pleaded enough facts to show—beyond "speculat[ion]" or just a "sheer possibility"—the Unions threatened, coerced, *and* restrained the shipping companies. *Wamer*, 27 F.4th at 466; *Meyers*, 983 F.3d at 880.

      (c)    The Unions' object was to force or require the shipping companies to cease doing business with Midwest.

The rest of the statute required Midwest to plausibly allege that "an object" of the Unions' threats, coercion, or restraint, was "forcing or

requiring" the shipping companies "to cease doing business with" Midwest. 29 U.S.C. § 158(b)(4)(ii)(B).  The first statutory term that needs defining here is "object."  Context suggests Congress used "object" to mean "[t]he purpose, aim, or goal of a specific action or effort."  American Heritage Dictionary at 904; *see also* Random House Dictionary at 1335.   The next term, "cease," means "[t]o put an end to; discontinue."  American Heritage Dictionary at 215; *see also* Random House Dictionary at 332.  And "business" here means "[c]ommercial, industrial or professional dealings; the buying and selling of commodities or service."  American Heritage Dictionary at 180; *see also* Random House Dictionary at 283.

Midwest's Second Amended Complaint established each of these elements.  As Midwest alleged, the Unions' "purpose, aim or goal" was "[t]o put an end to" or "discontinue" the shipping companies' "commercial … dealings" with Midwest.  American Heritage Dictionary at 904, 215, 180.  Midwest pleaded repeatedly throughout its Second Amended Complaint that this was *the* Unions' goal—at least while the labor dispute between the Unions and Midwest was ongoing—not just "*an* object," §158(b)(4)(ii).  (*See, e.g.*, SAC, R.64, #491, ¶93, #493, ¶107.)  Midwest backed up its claim by alleging in detail the scheme designed to accomplish that goal, including how that scheme unfolded through eight separate blockades between 2017 and

39

2018.  Midwest further alleged how Yockey *publicly admitted* this was the Unions' goal in an April 2017 meeting with the Port Authority.  (*Id.*, #489, ¶72.)  And Midwest alleged how the shipping companies *did*, in fact, stop "doing business" with Midwest, accomplishing the Unions' "object."  (*Id.*, #496, ¶¶137–39.)

The bottom line is this.  Applying the ordinary meaning of the statutory language here leads to one conclusion:  Midwest alleged enough facts to at least *plausibly* allege the Unions violated section 8(b)(4)(ii)(B) of the NLRA.

### 2.    The caselaw confirms Midwest's reading of the statute.

Caselaw from the Supreme Court, this Court, and other courts confirms Midwest properly pleaded a section 8(b)(4)(ii)(B) claim.

A good starting place for that analysis involves *another* case in which the ILA trapped cargo on the ships of neutral companies.  *See Int'l Longshoremen's Ass'n v. Allied Int'l* ("*Allied*"), 456 U.S. 212 (1982).  In *Allied*, the ILA ordered its members "to stop handling cargoes arriving from or destined for the Soviet Unions."  *Id.* at 214.  Following those orders, "longshoremen up and down the east and gulf coasts refused to service ships carrying Russian cargoes."  *Id.* at 215.  Allied International was an American importer of Russian wood products that relied on ILA members to unload its

ships docking in Boston. *Id.* The ILA's new policy thus caused great disruption to Allied's operations. *See id.*

The Supreme Court ultimately held the ILA had violated the secondary boycott provisions under section 8(b)(4)(B) of the NLRA. *Id.* at 222. The specific statute at issue in *Allied* was section 8(b)(4)(*i*)(B), which prohibits inducing or encouraging *employees* of neutrals to strike, rather than section 8(b)(4)(*ii*)(B). But the Court expounded on principles relevant to all secondary boycott cases arising under subparagraph (B) of section 8(b)(4). *See id.* at 222–23. In explaining why the ILA violated section "8(b)(4)(B)," the Court noted "[t]he ILA ha[d] no dispute with Allied" or the shipping and stevedoring companies with which Allied contracted. *Id.* at 222. Rather, the ILA's "sole complaint [was] with … the Soviet Union," and yet "the certain effect of its action [was] to impose a heavy burden on neutral employers." *Id.* This, the ILA could not do. "[I]t was just such a burden, as well as widening of industrial strife, that the secondary boycott provisions were designed to prevent." *Id.*

The ILA's conduct in *this* case was illegal for largely the same reasons the ILA's conduct was illegal in *Allied*. Here, "[t]he ILA ha[d] no dispute with" the international shipping companies. *Id.* The ILA's "sole complaint [was] with" Midwest. *Id.* at 223. Whatever the merits (or demerits) of the

41

ILA's dispute with Midwest, "the certain effect of its action [was] to impose a heavy burden on neutral employers." *Id.*

This Court's precedents only bolster the point. This Court has said a union violates section 8(b)(4)(ii)(B) when the union "brings economic pressure to bear on a 'primary employer' to do something the union wants ... by inducing a 'secondary employer' doing business with the primary employer to bring economic pressure on the primary employer.'" *Shafer*, 643 F.3d at 477 (quoting *Wilhelm*, 293 F.3d at 938). So "when a union has a problem with the 'primary' employer, it must focus its activities on that employer only." *Id.* at 940. What the union cannot do is "exert pressure, whether direct or indirect, on other neutral or unrelated 'secondary' employers." *Id.*

Thus, "it is clear that union conduct violates § 8(b)(4) ... when the union acts with the intent and object of causing a cessation of or interference with business between a neutral party and the primary employer." *Carruthers Ready-Mix, Inc. v. Cement Masons Loc. Union No. 520* ("*Carruthers*") 779 F.2d 320, 323 (6th Cir. 1985). And note—the purpose of pressuring the neutral employer need not be the union's "primary object or ... sole object" to violate this provision. *Shafer*, 643 F.3d at 477 (quotation omitted); *accord Wilhelm*, 293 F.3d at 940. (Although, here it *was* the "sole

42

purpose."  (SAC, R.64, #488, ¶65.))  It is enough to establish a violation of section 8(b)(4)(ii)(B) if pressuring the neutral employer is just *one* purpose of the Unions' actions.  *See id.*; *accord Carruthers*, 779 F.2d 320.

These principles show why Midwest properly pleaded a section 8(b)(4)(ii)(B) claim against the Unions.  The Unions had a "problem" with Midwest, but rather than "focus [their] activities on" Midwest, the Unions "exert[ed] pressure" on neutral shipping companies.  *Wilhelm*, 293 F.3d at 940.  The Unions exerted that pressure by orchestrating and participating in a scheme that deprived the shipping companies of pilots needed to dock and undock at the Port Midwest operated.  Because the Unions "act[ed] with the intent and object of causing a cessation of or interference with business between" the neutral shipping companies and Midwest, "it is clear" the Unions "violated § 8(b)(4)."  *Carruthers*, 779 F.2d at 323.

If more support were needed, *Gottfried v. Sheet Metal Workers' Int'l Ass'n, Loc. Union No. 80* ("*Sheet Metal Workers*"), 876 F.2d 1245 (6th Cir. 1989) (Nelson, J.), supplies it.  There, the primary employer refused to recognize or sign a collective bargaining agreement with the union.  *Id.* at 1247.  The unions responded by refusing to bargain with the secondary employer, which was owned by the same parent company as the primary employer.  *Id.*  The effect of the unions' conduct was "to deprive" the

secondary employer "of its complement of current employees ... thereby preventing or slowing completing of" its "construction projects."  *Id.*

This Court held that "[t]o apply economic retaliation or pressure in the background of a labor dispute is to coerce within the meaning of that verb as used in the statute."  *Id.* at 1250 n.1 (quotation omitted).  Accordingly, the Court found it "hard to see why ... the unions" had not "violat[ed] the secondary boycott provisions of the [NLRA]."  *Id.* at 1250.  Because the unions acted against one person with the "forbidden objective" of applying pressure on another, the Unions fell afoul of section 8(b)(4)(ii)(B).   *Id.* at 1247.

So too here.  The Unions "coerce[d]" the shipping companies by "apply[ing] 'economic retaliation or pressure" against the companies "in the background of" the Unions' "dispute" with Midwest.'"  *Id.* at 1250 n.1.  This "retaliation or pressure," *id.*, took the form of the Unions "depriv[ing]" the shipping companies of the pilots' services, "thereby preventing or slowing" the companies' arrival at or departure from Midwest's dock, *id.* at 1247.  And the Unions' primary dispute was not with the shipping companies; it was with Midwest.  The Unions' boycott against the shipping companies was thus unlawful secondary action.  *See id.* at 1247–50.

## II.    The District Court's Analysis is Unpersuasive.

In roughly two paragraphs, the District Court dismissed Midwest's section 8(b)(4)(ii)(B) claim.  The Court seemed to agree Midwest had adequately alleged the *purpose* component of a section 8(b)(4)(ii)(B) claim: that the Unions intended to "forc[e] or require[e]" the shipping companies to "cease doing business with Midwest," § 158(b)(4)(ii)(B).  (Op., R.92, #741.)  But, according to the Court, Midwest had "not plausibly alleged [the Union] engaged in prohibited conduct against the international shipping companies." (*Id.*)  That is, the District Court thought Midwest had not alleged the Unions "threaten[ed], coerce[d], or restrain[ed]" the shipping companies, § 158(b)(4)(ii).  (*See* Op., R.92, #741.) The Court's reasons for reaching that conclusion are not persuasive.

### A.    Midwest alleged the Unions engaged in more than mere picketing.

First, the District Court reasoned, "the mere fact that" the Unions "engaged in picketing – whether real or 'fake,' as Midwest alleges … does not plausibly suggest" the Unions "'threaten[ed], coerce[d], or restrain[ed] any person.'"    (Op. & Order, R.92, #740-41) (quoting 29 U.S.C. § 158(b)(4)(ii)(B).)  The District Court then noted, "[p]icketing has traditionally been a major weapon to implement the goals of a strike and has characteristically been aimed at all those approaching the situs whose

mission is selling, delivering or otherwise contributing to the operation which the strike is endeavoring to halt." (Op. & Order, R.92, #741 (quoting *United Steelworkers of Al., ALF-CIO v. N.L.R.B.* ("*United Steelworkers*"), 376 U.S. 492, 499 (1964)). Continuing, the District Court said, "the notion that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the employer involved in the labor dispute is 'coercion' within the meaning of section 8(b)(4)(ii)(B) ... [simply because] it has some economic impact on the neutral" was "untenable." (Op. & Order, R.92, #741 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast. Bldg. & Constr. Trades Council* ("*DeBartolo*"), 485 U.S. 568, 579 (1988)).

The first problem with this part of the District Court's analysis is that Midwest did not allege the Unions "mere[ly]" engaged in picketing. (Op. & Order, R.92, #741.) Instead, the Unions used the *pretense* of picketing to set in motion a coordinated plan to force international shipping companies to stop docking and undocking their ships at the Port. (SAC, R.64,, ##488–498, ¶¶64–155.) The District Court itself acknowledged the Unions engaged in "picketing *for the purpose of signaling to the Pilots that they should not bring ships in and out of Midwest's port.*" (Op., R.92, #740 (emphasis added).) Indeed, the picketing's alleged "intent" and "sole purpose" (SAC, R.64, ##488, 495 ¶¶130, 65)—or at least "*an object*" of it, §158(b)(4)(ii)—

was to trap the international shipping companies' vessels.  In doing so, the Unions intended to "bring economic pressure to bear on a 'primary employer' … by inducing a 'secondary employer' doing business with the primary employer to bring economic pressure on the primary employer.'" *Shafer*, 643 F.3d at 477.  That is the definition of an unlawful secondary boycott.  *See id.*

One way to look at it is that the picketing *itself* was largely beside the point—this was no persuasive appeal to the public to avoid business with Midwest.  The picketing instead served as a *predetermined signal* to pilots with the purpose and effect of trapping the shipping companies' boats.  The signal could have been anything.  It could have been, say, a noise, light, text message, and so on.  The signal here happened to be picketing, but the law does not care what *form* the signal took.  It only cares *that* the Unions acted to "threaten, coerce, or restrain" the shipping companies.  §158(b)(4)(ii).  That is what the Unions did.  *See NLRB v. Retail Store Ems Union ("Retail Store"),* 447 U.S. 607, 619 (1980) (Stevens, J., concurring) (noting the statutory ban on secondary boycotts under 8(b)(4)(ii)(B) was directed toward a "union's efforts to communicate its views that calls for an automatic response to a signal, rather than a reasoned response to an idea.").

47

Midwest does not quarrel with *United Steelworkers* acknowledging picketing as a "traditional[]" tool "to implement the goals of a strike" "aimed at all those approaching" the site of a labor dispute. *United Steelworkers*, 376 U.S. at 499. But there was nothing "traditional" about the Unions' "picketing." *Id.* The Unions picketing was not merely a "demonstration … outside" Midwest's dock designed "to protest" Midwest's "activities or policies and to pressure the entity to meet the protesters' demands." Picketing, Black's Law Dictionary 1386 (11th Ed. 2019)). The picketing was instead a predetermined command to pilots to trap international ships in their place—thereby forcing *neutral* shipping companies to stop doing business with Midwest when the Unions' *primary* dispute was with Midwest. (SAC, R.64, ##488–500, ¶¶64–155.)

Also note the ILA's conduct fits a familiar pattern of improper "signal picketing" other circuits have addressed. The Ninth Circuit and D.C. Circuit, for example, have described improper signal picketing as "an implicit instruction to other unions members, including union employees of secondary businesses," to engage in an illegitimate secondary boycott, "eliminating the need for the signaling union officials to make their direction explicit." *Overstreet ex rel. NLRB v. United Bhd. of Carpenters & Joiners of Am., Local 1506* ("*Overstreet*"), 409 F.3d 1199, 1215 (9th Cir. 2005); *accord*

*Sheet Metal Workers' Int'l Ass'n, Local 15* ("*Sheet Metal Workers' Local 15*") *v. NLRB*, 491 F.3d 429, 438 (D.C. Cir. 2007). That Midwest did not allege the pilots were themselves union employees does not matter. The defining feature of an improper signal picket is that it is used by the union as a *signal* to instruct a specific group of workers to accomplish a forbidden secondary objective. *Int'l Asso. of Bridge, etc. v. NLRB*, 598 F.2d 1154, 1158 n.6 (9th Cir. 1979); *see also NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 679, 690–91 (1951) (holding a union violated an earlier version of section 8(b)(4) of the NLRA in using a placard as a signal to employees of a neutral to not work).

In the end, though, this Court's decisional lodestar must be the "language of the statute." *Thompson*, 507 F.3d at 419. That language makes clear the Unions broke the law when they "threaten[ed], coerc[ed], or restrain[ed]" the international shipping companies with "an object" of "forcing or requiring" those companies "to cease doing business with" Midwest. 29 U.S.C. § 158(b)(4)(ii)(B).

## B. The Unions' picketing was threatening, coercive, and restraining conduct.

There is another problem with the District Court's reliance on *United Steelworkers*: the case does not stand for the point the District Court thought it did. According to the District Court, Midwest alleged the

Defendants had engaged in "mere ... picketing." (*Id.*, #740.) And, citing *United Steelworkers*, the Court reasoned "mere ... picketing" did not rise to the level of "threaten[ing], coerc[ive], or restrain[ing] conduct." (*Id.*, ##740–41.) Midwest already explained why the Unions engaged in more than "mere ... picketing." (*Id.*, #740.) But even setting that point aside, *United Steelworkers* did *not* hold that mere picketing could *not* rise to that level of force. Indeed, in *United Steelworkers*, the Supreme Court held the union's picketing *did* constitute threatening, coercive, or restraining conduct under section 8(b)(4)(ii). *See Steelworkers*, 376 U.S. at 496.

As the Supreme Court has further made clear, secondary picketing "that reasonably can be expected to threaten neutral parties with ruin *or substantial loss*" violates the Act's "ban on the coercion of neutrals." *Retail Store*, 447 U.S. at 614-15 (1980)) (emphasis added). This conduct can constitute an unfair labor practice "because it is coercive," and "[t]he restriction on secondary activity is 'keyed to the coercive nature of the conduct, whether it be picketing or otherwise.'" *520 S. Mich. Ave.*, 760 F.3d at 719-20.

In the part of *United Steelworkers* the District Court quoted, the Supreme Court was dealing with a different problem: whether the unions' activities were "nevertheless within the protected area of primary picketing

carved out by Congress in the proviso to subsection (B)." *United Steelworkers*, 376 U.S. at 496. That proviso says: nothing in section 8(b)(4)(ii)(B) "shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U.S.C. § 158(b)(4)(ii)(B). But the proviso is not at issue in this case. The Unions never made an argument based on it below. Said another way: the Unions never argued their efforts to "threaten," "coerce, or restrain" the shipping companies with "an object" of "forcing" them to "cease doing business with" Midwest were still a lawful *primary* picket. Of course, even if the Unions had made the argument below, it should fail because it is "clear" a union commits an unlawful *secondary* boycott when it "acts with the intent and object of causing a cessation of or interference with business between a neutral party and the primary employer." *Carruthers*, 779 F.2d at 323; *see Shafer*, 643 F.3d at 477; *Wilhelm*, 293 F.3d at 940. That is what happened here.

As for the District Court's reliance on *DeBartolo*, Midwest agrees not just "*any* kind of handbilling, picketing, or other appeals to a secondary employer … is 'coercion' … [simply because] it has some economic impact on the neutral." *DeBartolo*, 485 U.S. at 579. But the District Court failed to place *DeBartolo* in its proper context. The conduct in *DeBartolo* was a union's "peaceful" and purely "persuasive" distribution of handbills to a

51

mall's customers. *Id.* at 570, 580. The handbills asked "mall customers not to shop at any of the stores in the mall 'until the Mall's owner publicly promise[d] that all construction at the Mall [would] be done using contractors who pay their employees fair wages and fringe benefits.'" *Id.* at 571. "There [was] no suggestion that the leaflets had any coercive effect on customers of the mall." *Id.* at 578. There was no "violence, picketing, or patrolling." *Id.* There was "only an attempt to persuade customers not to shop in the mall." *Id.*

In concluding this type of "expressive" conduct was not coercive under the Act, the Supreme Court explained that applying section 8(b)(4) to prohibit peaceful handbilling would "pose[] serious questions of the validity of § 8(b)(4) under the First Amendment." *Id.* at 575-76. So the Supreme Court applied a rule of constitutional avoidance: it read the statute to permit the union's conduct and thus avoided a potential conflict between the statute and the Constitution. *See id.* Notably, the Court contrasted handbilling with picketing's "mixture of conduct and communication," where it is "the conduct element" rather than the ideas expressed that "often provides the most persuasive deterrent to third persons about to enter a business establishment." *Id.* at 580.

The differences between *DeBartolo* and this case are palpable. Of course, this case does not involve "peaceful handbilling." More generally, it does not involve *any* attempt to merely "persuade." In rejecting the ILA's First Amendment argument in *Allied*, the Court explained that the ILA's "conduct [was] designed not to communicate but to coerce." *Allied,* 456 U.S. at 226. Likewise, the picketing here was never intended to persuade the shipping companies of anything; it was only intended to stop them from doing business with Midwest by "*forc*[e] or *requir*[ement]." § 158(b)(4)(ii)(B). Precisely because the Unions' conduct did not involve a peaceful means of "communicat[ion]" but instead an especially "coerc[ive]" form of picketing, this Court has no reason to apply the constitutional avoidance cannon in this case. *Allied*, 456 U.S. at 226. The Court need only apply the statute's text as written. *See id*. at 222–23, 226–27.

Doing so makes plain the Unions "threaten[ed], coerc[ed], or" at a minimum, "restrain[ed]" the shipping companies. §158(b)(4)(ii). As with all statutory text, there may be difficult cases applying the meaning of the text in particular cases. § 158(b)(4)(ii)(B). But here, "classifying [the] union conduct is easy." *NLRB v. Int'l Union of Operating Eng'rs*, 400 U.S. 297, 303 (1971). The Unions "forcibly" "dominat[ed]" or "restrain[ed]" the shipping companies when they trapped the companies' ships in or outside

53

the Port by depriving the ships of pilots.  American Heritage Dictionary at 258.  Having done that enough times, the Unions eventually "compel[led]" the companies to stop doing business with Midwest under "threat" of more economic pain.  *Id.*  The Act does not permit this conduct.  § 158(b)(4)(ii)(B).

### C.    The District Court misread Midwest's Second Amended Complaint as resting on a flawed theory of derivative liability.

The second reason the District Court gave for rejecting Midwest's claim is no more persuasive than the first.  According to the District Court, Midwest's claim "rest[ed] on a theory of derivative liability." (Op. & Order, R.92, #741).  In the District Court's view, "Defendants asked the Pilots, and the Pilots agreed, to do something which Defendants were not permitted to do themselves and, therefore, Defendants should be held liable." (*Id.*)  The problem with this theory, reasoned the District Court, was "Midwest offer[ed] no basis on which Defendants may be deemed to have undertaken the actions of an unaffiliated third party." (*Id.*)  The District Court did not think, for example, Midwest "include[d] any allegations that the Pilots acted as Defendants' agents (rather than of their own volition) when [the pilots] chose not to board the ships." (*Id.*)

Multiple problems permeate the District Court's reasoning.  Before addressing them, keep in mind that section 8(b)(4) of the NLRA makes it

unlawful for *either* a "labor organization" *or* its "agents" to engage in a proscribed unfair labor practice, like a secondary boycott. 29 U.S.C. § 158(b). And if *either* a labor organization *or* its agents does engage in an unfair labor practice, then 29 U.S.C. § 187 authorizes an injured individual to file suit against the *labor union*. In other words, federal labor law holds a *labor union* accountable for *both* the acts of the *labor union* itself and the acts of its agents. 29 U.S.C. §§ 158(b), 187.

As explained above, Midwest plausibly alleged Yockey, Baker, and Local 1982 members who participated in the blockades from 2017 to 2018 acted as the agents of each of the Unions. *Supra* 29–30. Nobody at the District Court seemed to dispute the point. The District Court *did* incorrectly think the *pilots* were not agents of the Unions, but set that aside for the moment. Midwest *need not* prevail on that point (though Midwest *should* prevail on it) to hold the Unions accountable. That is because even if the pilots were not the Unions' agents, the Unions are still responsible for their actions and the acts of Yockey, Baker, and the participating Local 1982 members who *were* the Unions' agents.

It was the *Unions* (though Yockey, Baker, and participating members) who orchestrated the scheme of setting up pickets, signaling the pilots, and blockading the ships. (SAC, R.64, ##488–498, ¶¶64–155.) The Unions did

55

not just direct the scheme from afar either. They actively participated by picketing and, in so doing, sent the signal to the pilots to not navigate ships. (*Id.*) Indeed, Midwest alleged one instance in which Yockey *himself* picketed at ships in the water on a pontoon boat. (*Id.*, #493, ¶¶105–06.) During that same incident, Yockey contacted "the ships via radio" and instructed the pilots to stop navigating the ships and abide by their agreement. (*Id.*, ¶106.) On top of all that, Yockey issued a press release the following day to support the continued blockade of "three foreign flag vessels" that had been "trapped in the Port for over a week." (Ex. P, R.64-15, #548.)

To be sure, the pilots were among the *means* by which the Unions "threaten[ed], coerc[ed], or restrain[ed]" the shipping companies. § 158(b)(4)(ii). But the NLRA does not say *how* the labor unions had to "threaten, coerce, or restrain" to violate section 8(b)(4)(ii)(B). Nor does the ordinary meaning of "threaten, coerce, or restrain" limit how those actions are accomplished. As this Court has said, a union "may not exert pressure, *whether direct or indirect*, on other neutral or unrelated 'secondary' employers" when the union's real dispute is with the primary employer. *Wilhelm*, 293 F.3d at 940 (emphasis added).

Moreover, the Supreme Court has held that unions are liable for acts "*reasonably likely* to threaten the neutral party with ruin or substantial

loss." *Retail Store*, 447 U.S. at 615 n.11 (emphasis added).  In *Retail Store*, the Court held a union's secondary picketing was coercive because it was "reasonably calculated to induce customers not to patronize the neutral parties at all," *id.* at 610, and the absence of customers "reasonably can be expected to threaten neutral parties with ruin or substantial loss," *id.* at 614–15.  The same is true here.  The Unions' conduct was "reasonably calculated to induce" pilots not to navigate "the neutral parties at all," *id.* at 610, and the absence of pilots could "reasonably … be expected to threaten" the shipping companies "with ruin or substantial loss."  *Id.* at 614–15.  *See Kroger Co. v. NLRB*, 647 F.2d 634 (6th Cir. 1980) (overturning dismissal of secondary boycott claims under same precedent); *cf. Shafer*, 643 F.3d at 478 (defining legal cause of harm as unlawful conduct that "materially contributed" to or is a "substantial factor" in bringing about the harm).

The District Court's reasoning also fails on its own terms because Midwest alleged the pilots *were* agents of the Unions.  *Supra* 29–30.  An "agent" is defined as someone who acts on another's behalf, subject to the other's control and with the other's consent.  *See* Restat 2d of Agency, § 1.

Midwest alleged ample facts showing the pilots acted on behalf of the Unions with the Unions' consent and subject to the Unions' control.  The pilots acted *on behalf* of the Unions by playing a part in the Unions' scheme,

which was designed to achieve the Unions' goals. The pilots acted under an implied or express agreement with the Unions, so the pilots had the Unions' *consent*. The pilots likewise acted subject to the Unions' *control*. That fact is borne out over the eight separate incidents Midwest alleged in which the pilots did exactly *what* the Unions wanted *when* the Unions wanted. (SAC, R.64, ##488–498, ¶¶64–155.) Not *once* in those eight incidents spanning more than a year did a pilot block a ship on his or her own or refuse to block a ship when the Unions gave the signal. It is therefore reasonable to infer from Midwest's allegations that the Unions controlled the pilots' conduct.

For largely the same reasons, Midwest plausibly alleged the Unions "instigated, authorized, solicited, ratified, condoned or adopted" the pilots' actions. *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 355 (6th Cir. 1983); *accord Dist. 30, UMW, & Local 1834 v. NLRB*, 819 F.2d 651, 655 (6th Cir. 1987). Under this Court's precedents, that provides a separate, independent reason for finding the pilots were the Unions' agents. *See Kitchen Fresh*, at 355; *Dist. 30*, at 655.

Midwest thus plausibly alleged every element necessary to establish the pilots were the Unions' agents in carrying out the Unions' scheme. Although Midwest did not formally call the pilots "agents" in its Second Amended Complaint, it did not need to. Courts, including this Court, look

not to *labels* but the *substance* of a complaint's allegations when deciding whether to dismiss a plaintiff's complaint entirely or in part. *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 795 (6th Cir. 2003); *see Urban Assoc. v. Standex Elec*, 216 F. App'x 495, 510 (6th Cir. 2007) ("In determining the existence of an agency relationship … substance controls over … conclusory assertions of agency.").

The District Court erred when it overlooked the substance of Midwest's allegations in concluding Midwest's Second Amended Complaint did not adequately allege the pilots were the Unions' agents.

## **CONCLUSION**

For the foregoing reasons, the Court should reverse.

Respectfully submitted,

/s/    *Lauren S. Kuley*

|  |  |
|---|---|
| Aaron T. Tulencik | Lauren S. Kuley |
| Tulencik Law Firm | Shams H. Hirji |
| 7720 Rivers Edge Drive | Squire Patton Boggs (US) LLP |
| Suite 126 | 201 E. Fourth Street, Suite 1900 |
| Columbus, OH 43235 | Cincinnati, Ohio 45202 |
| Telephone: (614) 406-1127 | Telephone: (513) 361-1200 |
| atulencik@icloud.com | Facsimile:  (513) 361-1201 |
|  | lauren.kuley@squirepb.com |
|  | shams.hirji@squirepb.com |

## <u>DESIGNATION OF DISTRICT COURT DOCUMENTS</u>

| <u>Doc No.</u> | <u>PageID#</u> | <u>Description</u> |
|---|---|---|
| 1 | 1-20 | Complaint |
| 10 | 61-81 | Amended Complaint |
| 64 | 478-501 | Second Amended Complaint |
| 64-1 | 502 | Ex. A to Second Amended Complaint |
| 64-2 | 504-516 | Ex. B to Second Amended Complaint |
| 64-3 | 517-519 | Ex. C to Second Amended Complaint |
| 64-4 | 520 | Ex. D to Second Amended Complaint |
| 64-5 | 521-531 | Ex. E to Second Amended Complaint |
| 64-6 | 532 | Ex. F to Second Amended Complaint |
| 64-7 | 533-534 | Ex. H to Second Amended Complaint |
| 64-8 | 535-536 | Ex. I to Second Amended Complaint |
| 64-9 | 537-538 | Ex. J to Second Amended Complaint |
| 64-10 | 539 | Ex. K to Second Amended Complaint |
| 64-11 | 540-541 | Ex. L to Second Amended Complaint |
| 64-12 | 542 | Ex. M to Second Amended Complaint |
| 64-13 | 543-544 | Ex. M to Second Amended Complaint |
| 64-14 | 545-547 | Ex. O to Second Amended Complaint |
| 64-15 | 548 | Ex. P to Second Amended Complaint |

| 75 | 573-575 | ILA's Mot. To Dismiss |
|---|---|---|
| 75-01 | 576-598 | Memo in Support of ILA's Mot. To Dismiss |
| 77 | 608-609 | Local 1982 and District Council's Mot. To Dismiss |
| 77-01 | 610-614 | Memo in Support of Local 1982 and District Council's Mot. To Dismiss |
| 81 | 625-637 | Response in Opposition to Defendants' Motion to Dismiss |
| 82 | 639-647 | Plaintiff's Motion for Leave to Add Party Defendants and Amend the Complaint |
| 83 | 648-674 | Third Amended Complaint |
| 85 | 678-695 | ILA's Reply in Support of Motion to Dismiss |
| 87 | 698-702 | Reply in Support of Local 1982 and District Council's Mot. To Dismiss Second Amended Complaint |
| 92 | 730-746 | Opinion & Order |
| 93 | 747 | Judgment Entry |
| 95 | 750-751 | Notice of Appeal |

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with Federal Rules of Appellate Procedure 29(c)-(d) and 32(a)(7)(B)(i).  The brief was prepared in Microsoft Word, using Georgia 14-point font.  According to the word count function, the word count, including footnotes and headings, is 12,979.


*/s/ Lauren S. Kuley*
Lauren S. Kuley

## CERTIFICATE OF SERVICE

It is hereby certified that on June 24, 2022 the foregoing was electronically filed with the Clerk of the Court via the Court's ECF system. Counsel for Plaintiffs will be served by the ECF system.

*/s/ Lauren S. Kuley*
Lauren S. Kuley